

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
11/03/2009

| | | |
|---|---|---|
| IN RE: | § | |
| CAROL ANN NORRA; aka MANNING; | § | Case No. 08-38157 |
| aka BECKWITH, | § | |
| Debtor(s). | § | |
| | § | Chapter 11 |
| | § | |
| CAROL ANN NORRA, | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | Adversary No. 09-03066 |
| | § | |
| HARRIS COUNTY, TEXAS, *et al*, | § | |
| Defendant(s). | § | Judge Isgur |

### MEMORANDUM OPINION

This adversary proceeding concerns whether a Chapter 11 debtor can claim two mobile home parks as her exempt homestead under Texas law.  Ms. Norra resides at one of the mobile home parks and the other park is approximately 20 miles away.  Ms. Norra claims that the real property at both parks and certain mobile homes located at the parks qualify as her homestead. Harris County, the Texas Commission on Environmental Quality ("TCEQ") and the Texas Department of State Health Services ("DSHS") object to Ms. Norra's claimed homestead exemption.  As set forth below, the Court finds that all the property at Ms. Norra's residence qualifies as Ms. Norra's homestead and none of the property at the other mobile home park satisfies Texas's homestead requirements.

### Jurisdiction

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code.  28 U.S.C. § 157(a) allows the district courts to refer bankruptcy cases to the bankruptcy judges for their districts.  The District Court

for the Southern District of Texas has made such a reference of its bankruptcy cases. General Order 2005-12.   Pursuant to this reference, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b)(1) to "hear and determine ... all core proceedings arising under title 11, or arising in a case under title 11."   This proceeding to determine whether certain property of a debtor in bankruptcy qualifies as the debtor's exempt homestead is a core proceeding. 28 U.S.C. § 157(b)(2)(B).

## Background

This case arises from objections filed by Harris County, TCEQ and DSHS[1] to Ms. Norra's claimed homestead exemption.[2]

Ms. Norra owns properties (collectively, the "Properties") located at 205 Reidland Road in Houston, Texas ("Reidland") and 2323 Lauder Road in Crosby, Texas ("Lauder").   The Properties are located approximately 20 miles from one another.   Ms. Norra acquired the Properties through separate transactions in the early 1980's and has continuously operated the mobile home parks that already existed on the Properties before she acquired them.   Ms. Norra rents both mobile home spaces and mobile homes at the Properties on a month-to-month basis through oral lease arrangements.   The revenue generated from the Properties, which fluctuates each month based on occupancy, is the primary source of Ms. Norra's income.   As set forth below in more detail below, Ms. Norra claims that the Properties have been her homestead since early 2005 when she (i) made Reidland her residence, and (ii) set up an office at and moved personal belongings to Lauder.

---

[1] Collectively, TCEQ and DSHS will be referred to as the "State."

[2] An examiner, appointed by the U.S. Trustee, has filed a sealed report with the Court.  The sealed report plays no role in the Court's decision and has not been considered in issuing this opinion.

1.  **General Information Concerning the Properties**

The Lauder property is approximately 1.2 acres and has approximately 30 rental spaces for mobile homes.  In addition to the land itself, there are four mobile homes[3] at Lauder that Ms. Norra claims comprise the Lauder portion of her homestead.  Two of the four mobile homes claimed as exempt (#C and #11) have been rented by Ms. Norra to tenants on a month-to-month basis in the past.  Ms. Norra was not the original owner of #C and #11 but she claims ownership because both mobile homes were abandoned by their original owners over ten years ago.[4]

The Reidland property is approximately 5 acres.  Ms. Norra claims all of the land and all of the mobile homes at Reidland as part of her homestead.  Ms. Norra owns approximately eighteen mobile homes at Reidland outright and claims to own approximately fourteen homes through the abandonment of the homes by previous owners.  Since the outcome of this opinion is unaffected by whether Ms. Norra is the true owner of all the mobile homes at Reidland, the Court will assume (without deciding) that Ms. Norra is the owner of all the mobile homes at Reidland.  The Reidland mobile homes sit on concrete blocks and are arranged side-by-side in two rows of approximately sixteen mobile homes each.[5]  The mobile homes are not set apart

---

[3] The four mobile homes at issue are #C, #2, #4 and #11.

[4] For the purposes of this opinion, it is unnecessary for the Court to determine the extent of Ms. Norra's ownership of mobile homes that were previously owned and subsequently abandoned by third parties at both the Lauder and Reidland properties.  "Under Texas law, [a homestead claimant] need not hold the property in fee simple in order to invoke homestead protection." *In re Perry*, 345 F.3d 303, 314 (5th Cir. 2003).  A "homestead may attach to any possessory interest, subject to the inherent characteristics and limitations of the right, title or interest in the property." *Id.*  Thus, Ms. Norra may claim the abandoned mobile homes as exempt from creditors, even if third parties have a greater ownership interest in the mobile homes. *See Id.* at 315 ("A homestead interest in the possessory estate of a tenancy at will protects [the claimant's] possessory interest in [the land] against all creditors-except the owner, or one with better title.").

[5] The Court approximates the number of mobile homes because of the inconsistent information provided by the parties.  Documents submitted to the Court show that there could be between twenty-seven and thirty-four mobile homes at Reidland.  The Court recognizes the unique circumstances surrounding Reidland make it difficult to accurately account for every mobile home.  For example, some mobile homes are dilapidated and abandoned, while others are used solely for storage and spare parts.  The parties may have chosen to account for such mobile homes in different ways.  Nevertheless, the outcome of this opinion is unaffected by the actual number of mobile homes at Reidland, whether it is twenty-seven, thirty-four, or somewhere in between.

from one another by any sort of fence or dividing structure.  All of the residents, including Ms. Norra, access their respective mobile homes via a road running between the two rows of mobile homes.

Ms. Norra expressed the intent to continue renting spaces and mobile homes at the Properties after the conclusion of her bankruptcy case.  Ms. Norra also stated her intention to eventually develop the large open space at the rear of Reidland.  She claims that she will build a more permanent home or place a new double-wide trailer on a portion of this open space.

## 2. Activity at the Properties Since 2005

Since 2005, Ms. Norra has resided at Reidland.  She initially lived in mobile home #12 but has since relocated to two units that she designates as "Trailer #22."

Ms. Norra has never lived at Lauder.  She usually visits Lauder once a month to meet with her manager (who lives at Lauder) and to perform light maintenance work.  Since 2005, Ms. Norra has used vacant mobile homes, primarily mobile home #4, for various purposes.  For example, Ms. Norra has received rent, kept spare clothing and toiletries, and occasionally taken naps at trailer #4.[6]  Ms. Norra has also used her vacant mobile homes at Lauder for storage space and as a source for spare parts, sometimes transporting the spare parts for use at Reidland.

At the time of Ms. Norra's bankruptcy filing on December 29, 2008, there were approximately 15-20 tenants renting spaces at Lauder.  There were approximately 15-20 tenants renting mobile homes owned by Ms. Norra at Reidland.  Approximately 15 of the mobile homes at Reidland were vacant, dilapidated, and uninhabitable, but many were still being used for storage space and as a source for spare parts.

---

[6] Ms. Norra is 69 years old and takes occasional naps when she becomes tired while at the Lauder property and does not wish to drive twenty miles to her home at Reidland.

On March 13, 2009, this Court lifted the automatic stay to permit state and local regulatory authorities to take possession of the Lauder property. The stay was lifted because of septic tank overflows on the Lauder grounds in violation of health and safety rules and regulations. Lauder was subsequently closed by state and local authorities and is not expected to reopen.[7]

### 3. Issue Presented

The parties do not dispute that the Properties have the characteristics of a rural homestead. There is also no dispute over whether Trailer #22 and the land on which it sits at Reidland qualifies as Ms. Norra's homestead.

The issues the Court must determine are the extent to which Lauder, Reidland, and the respective mobile homes thereon (except Trailer #22) qualify as Ms. Norra's homestead.

Ms. Norra claims that all the land at Lauder and Reidland is her homestead. She also claims that four mobile homes at Lauder and all the mobile homes at Reidland are her homestead.

The State does not object to Ms. Norra's claim that the land at Reidland is her homestead. The State also does not object to the exemption of trailers #1, #2, #22, and #28 at Reidland because the State is satisfied that Ms. Norra uses those units as her home or for personal storage. However, the State objects to the classification of the remaining mobile homes at Reidland and all the property and mobile homes at Lauder as Ms. Norra's homestead. The thrust of the State's argument is that the permanent renting of the remaining mobile homes at Reidland and lack of residence at Lauder deprive the respective properties of homestead status.

---

[7] The closure of Lauder was the culmination of years of disputes between regulatory authorities and Ms. Norra over violations of health and safety rules at the Properties due to unsafe drinking water and the overflow of raw sewage from septic tanks.

Except for Trailer #22 at Reidland, Harris County objects to the entire homestead claimed by Ms. Norra. Harris County raises, in substance, the same arguments as the State but goes further than the State in the relief it seeks, which is the subdivision of Reidland so that only a portion remains Ms. Norra's homestead.[8]

A bifurcated trial was held on May 20, 2009 and June 18, 2009 to determine the extent of Ms. Norra's homestead. For the reasons set forth below, the Court finds as follows:

i.  Neither the Lauder property nor any of the mobile homes thereon qualify as Ms. Norra's homestead.

ii. All of the Reidland property and its mobile homes qualify as Ms. Norra's homestead.

## Analysis

"In a bankruptcy case filed in Texas, a debtor may claim either the federal exemptions provided by the Bankruptcy Code or the exemptions provided by Texas state law." *In re Peres*, 2007 WL 2766776, *2 (Bankr. N.D. Tex September 18, 2007) (citing 11 U.S.C. §§ 522(b)(1)-(2)); *see also Perry*, 345 F.3d at 311 n.5 ("Election of the state exemption scheme permits the debtor to claim the general exemptions contained in the Texas Property Code, while election of the federal scheme relegates the debtor to the exemptions specified in § 522(d) of the Bankruptcy Code."). In this case, Ms. Norra claims Lauder and Reidland (and certain mobile homes situated there) are her exempt homestead under Texas law. This Court must look to Texas law to determine the extent to which the properties at issue satisfy Texas's homestead requirements. *See In re Moody*, 77 B.R. 580, 590 (S.D. Tex. 1987) ("Bankruptcy courts must resort to state law for an interpretation of state exemption rights in homesteads."), *aff'd*, *In re Moody*, 862 F.2d 1194, 1201 (5th Cir. 1989), *cert. denied*, *Moody v. Smith*, 503 U.S. 960, 112 S. Ct. 1562, 118 L. Ed. 2d

---

[8] Harris County seeks to subdivide the majority of Reidland; however, Harris County acknowledges that Ms. Norra is entitled to, at a minimum, a one acre lot on Reidland.

209 (1992); *In re Leonard*, 194 B.R. 807, 810 (Bankr. N.D. Tex. 1996 ("[B]ankruptcy court must look to state law to interpret state homestead exemption rights.").

The starting point on questions regarding Texas homestead law is current constitutional and statutory authority. *In re Mitchell*, 132 B.R. 553, 557 (Bankr. W.D. Tex. 1991).   Article XVI, § 51 of the Texas Constitution provides:

> The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town or village, shall consist of lot or contiguous lots amounting to not more than 10 acres of land, together with any improvements on the land; provided, that the homestead in a city, town or village shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired . . . .

TEX. CONST. art. XVI, § 51.

Section 41.002(b)(2) of the Texas Property Code further defines the rural homestead: "If used for the purposes of a rural home, the homestead shall consist of . . . for a single, adult person, not otherwise entitled to a homestead, not more than 100 acres, which may be in one or more parcels, with the improvements thereon." TEX. PROP. CODE. ANN. § 41.002(b)(2) (Vernon 2000).

It is longstanding and fundamental policy that homesteads are favorites of the law and that courts must liberally construe the constitutional and statutory provisions protecting homestead exemptions. *In re Webb*, 263 B.R. 788, 791 (Bankr. W.D. Tex. 2001) ("The starting point in determining homestead issues is, of course, that '[b]ecause homesteads are favorites of the law, we must give a liberal construction to the constitutional and statutory provisions that protect homestead exemptions.'") (quoting *Bradley v. Pac. Sw. Bank (In re Bradley)*, 960 F.2d 502, 507 (5th Cir. 1992)); *Mitchell*, 132 B.R. at 557 ("Homestead laws are favored and will be

liberally construed to protect the homestead."); *Denmon v. Atlas Leasing, L.L.C.*, 285 S.W.3d 591, 595 (Tex. App.—Dallas 2009, no pet. h.) ("Homestead rights have traditionally enjoyed great protection, and statutes that affect such rights are liberally construed to protect the homestead."); *PaineWebber, Inc. v. Murray*, 260 B.R. 815, 822 (E.D. Tex. 2001) ("When interpreting these provisions, a court must liberally construe them to protect the homestead. Indeed, a court must uphold and enforce the Texas homestead laws even though in so doing [the court] might unwittingly 'assist a dishonest debtor in wrongfully defeating his creditor.'") (quoting *Cocke v. Conquest*, 120 Tex. 43, 35 S.W.2d 673, 678 (1931)).

"Whether a tract of land is protected homestead property is a question of fact." *In re Baker*, 307 B.R. 860, 864 (Bankr. N.D. Tex. 2003). The initial burden of proof is upon the homestead claimant to prove that homestead status has been met. *Perry*, 345 F.3d at 311. This burden "is a short hurdle" for debtors. *Bradley*, 960 F.2d at 507. The claimant must satisfy a two-prong inquiry by providing evidence of "both (i) overt acts of homestead usage, and (ii) the intent to claim the land as a homestead." *Perry*, 345 F.3d at 311. However, "as long as the claimant can demonstrate that she has used her property for homestead purposes, then Texas courts will presume the homestead claimant possesses the requisite intent." *Bradley*, 960 F.2d at 507. Next, "[o]nce the claimant has made a *prima facie* case in favor of homestead status, the objecting party has the burden of demonstrating that the homestead rights have been terminated." *Perry*, 345 F.3d at 311.

With regard to proof, Texas homestead law draws an important distinction between property that the debtor resides upon and non-contiguous, separated property. *See, e.g., Perry*, 343 F.3d at 318 n.22 ("Perry's home is not separated or detached from the mobile home park. He and his wife live in the same building which houses the park's office and store. Had the park

been *separated* from Perry's *residence*, this *case would have been decided differently.*")
(emphasis added).  A debtor faces fewer legal obstacles when the debtor claims only land
connected to the debtor's residence as the debtor's homestead. *See Bradley*, 960 F.2d at 507
("Possession and use of land by one who owns it and who resides upon it makes it the homestead
in law and in fact.") (citing *First Interstate Bank v. Bland*, 810 S.W.2d 277, 286 (Tex. App.—
Fort Worth 1991, no writ); *Sifuentes v. Arriola*, 2009 WL 1099253, *3 (Tex. App.—Austin April
22, 2009, no pet. h.) ("As a starting point, we presume that one who owns and resides on a lot
makes the whole lot his homestead."); *Vaughn v. Vaughn*, 279 S.W.2d 427, 435 (Tex. Civ.
App.—Texarkana 1955, writ refused n.r.e.) ("[C]ontiguity of lots or parcels of land presents a
'situation * * * decidedly favorable for extending to the outside boundaries the homestead
limits,' and, while the Constitution authorizes lots or parcels of land not contiguous to be united
in one homestead, 'it would naturally require more distinct evidences of such destination in
proportion to the inconvenience of using as parts of the same home lots remote from each
other.'") (quoting *Youngblood v. Youngblood*, 124 Tex. 184, 76 S.W.2d 759, 760 (1934)).

A debtor must show that property "*separated* from the land on which the claimant resides
[is] used *principally for the purposes of a home* if it is to be included in [the debtor's] rural
homestead." *Perry*, 343 F.3d at 318 n.22 (emphasis added); *see also Webb*, 263 B.R. at 792
("Both the express language of § 41.002(b) and the case law make it clear that property separated
from the tract where the residence is located, to be included in a rural homestead, must be 'used
for home purposes.'") (citing *Cocke*, 35 S.W.2d at 678).  In order to satisfy the "use for purposes
of a home" requirement, a debtor must show that the non-contiguous property is "used in
connection with the home tract for the [debtor's] comfort, convenience, or support . . ." *Baker*,
307 B.R. at 863; *see also Webb*, 263 B.R. at 792 ("There must be some act done which will

evince an intention . . . to use it in some way, in connection with the home place, for the comfort, convenience or support of the family, or as a place of business for the head of the family.").

Since the homestead question is a fact specific inquiry and because this case involves contiguous and non-contiguous homestead claims, the Court will evaluate the facts and relevant law concerning Lauder and Reidland separately.

### 1. The Lauder Property

With regard to Lauder, the Court must determine whether renting non-contiguous property for the purpose of generating rental income fits within the "comfort, convenience or support" requirement.

The Court's analysis begins with *Autry v. Reasor*, which is "a leading authority on the homestead questions involved here, has been frequently cited with approval, and has never been overruled by the Supreme Court of this state." *Vaughn*, 279 S.W.2d at 434. In *Autry*, the debtor rented 39 acres of non-contiguous land continuously from the time he purchased the land in exchange for a portion of his tenants' annual crop. *Autry v. Reasor*, 102 Tex. 123, 113 S.W. 748, 748 (1908). The Texas Supreme Court denied the debtor's homestead claim, finding that renting non-contiguous land "deprive[d] [the land] of its homestead character." *Id.* The Court based its decision upon the fact that "there was no evidence that the land was used for the purpose of a home, other than that the proceeds were probably used in support of the family." *Id.* Thus, *Autry* established that the act of renting non-contiguous land, alone, is insufficient to impress homestead status upon the land, even though the rental income is used by the debtor for financial support. *See also Baker*, 307 B.R. at 860 ("The payment of rent is not the type of 'support' that Texas homestead law recognizes as providing 'comfort, convenience, or support of the family.'").

*Autry's* holding, although it employs an antiquated view of the homestead, has remained the law of Texas for over a century. *See, e.g., Webb*, 263 B.R. at 792 (recognizing that the "historical context of these older cases must be considered" but nevertheless relying, in part, upon *Autry* as a basis for its decision).  In 2003, the Fifth Circuit summarized a number of cases where non-contiguous property achieved homestead status: "A separate parcel has been held to be part of the homestead where proof has been provided indicating that the land has been used as a site for a garage, stable, barn, horse, lot, pasture, garden, or playground for the children of the family." *Perry*, 343 F.3d at 318 n.22.  However, the Fifth Circuit made clear that non-contiguous rental property does not enjoy the same treatment: "*Separate land* that is devoted *primarily* to *generating income* for the family . . . is not used principally for home purposes and thus is not included in the rural homestead." *Id.* (emphasis added).

This Court is also influenced by Judge Kelly's *Webb* decision. *See Webb*, 263 B.R. at 788.  In *Webb*, the debtors sought to exempt three non-contiguous parcels of land in addition to their residence. *Id*. at 790.  The debtors rented a house on each of the separate parcels. *Id.*  The sole issue of the case was whether the debtors' "use of the three tracts as rental properties qualifie[d] as a 'use for the purposes of a home.'" *Id.* at 792.  After a comprehensive survey of over 100 years of Texas homestead case law, the court rejected the debtors' homestead claim. *Id.* at 792-95.  *Webb* explained:

> In this case, nothing supports the Debtors' exemption claim of the rental properties other than that the *income they produce is used for the support of the Debtors' family*. The cases illustrate that, even during those times when renting agriculture land for a share of the crops might not preclude its exemption, *it has always been the rule that the mere use of the rental proceeds as income, or "support," without any other use of the property "for the purposes of a home," is insufficient to qualify it as a rural homestead.* To follow the Debtors' logic would be to state a rule wherein a debtor could acquire dozens of rent houses, scattered throughout the state, and so long as each was situated on a rural tract and the aggregate acreage fit within the amounts allowed by law, each "rent house" could

be claimed as the debtor's "homestead". Homestead is, this court thinks, a different proposition. As stated in the case law, the land must be used for some "purpose" of a home. Rent houses are not within that intendment.

*Id.* at 795 (emphasis added).

This case fits squarely within *Autry* and *Webb*. Ms. Norra has never lived at Lauder, which is approximately 20 miles away from Ms. Norra's residence, and has always used Lauder for the purpose of generating rental income. She has used Lauder as an occasional office, resting space, source for spare parts, and storage site; such usage has been primarily (if not completely) linked to her business interests at Lauder. Based upon these facts, the Court finds that Ms. Norra has failed to meet her initial burden of proof.

Ms. Norra has not established that Lauder is "used principally for the purposes of a home." *Perry*, 343 F.3d at 318 n.22. To the contrary, the evidence at trial overwhelmingly established that Ms. Norra's use of Lauder was for the primary, if not sole, purpose of generating rental income. Ms. Norra never lived at Lauder and only visited Lauder approximately once a month to collect rent and meet with her manager. Ms. Norra used mobile homes at Lauder as a source for spare parts and makeshift office. This usage was not for the purpose of a home but for the purpose of conducting a property rental business. The only evidence supporting Ms. Norra's claim of homestead at Lauder was her use of Lauder as a temporary resting space and storage site for personal items. The evidence also demonstrated, however, that the only occasions when Ms. Norra would rest at Lauder were when she was tired from her work. No evidence at trial indicated that Ms. Norra traveled to Lauder specifically for the purpose of rest and relaxation, or for any other home purposes. Ms. Norra's use of Lauder was unambiguously for the primary purpose, if not sole purpose, of generating rental income.

The Court is unpersuaded that the act of taking occasional naps and keeping personal supplies at a place devoted to generating rental income is sufficient to impress a homestead character upon non-contiguous property.  In fact, this usage fits directly within the Fifth Circuit's statement that "[s]*eparate* land that is devoted *primarily to generating income* . . . is not used principally for home purposes and thus is not included in the rural homestead." *Id.* (emphasis added).  Accordingly, since Lauder is non-contiguous property devoted primarily to generating rental income, neither Lauder nor the four mobile homes thereon qualify as Ms. Norra's homestead.

### 2.  The Reidland Property

At the outset, the Court notes that the Reidland inquiry is categorically distinct from the Lauder inquiry, despite the fact that mobile homes are at issue on both Properties.  This distinction is due to Ms. Norra's residence at Reidland since 2005.  By establishing residence, Ms. Norra has met her burden of demonstrating overt acts of homestead usage and the intent to claim the land as a homestead. *See Perry*, 345 F.3d at 311 (explaining the initial burden of proof that debtors must overcome before the burden shifts to the objecting party); *see also Sifuentes*, 2009 WL 1099253, at *3 ("As a starting point, we presume that one who owns and resides on a lot makes the whole lot his homestead . . . [and] [w]hile homestead claimants normally do have to demonstrate intent, property owners who reside on and use their property do not.").  Accordingly, unlike Lauder, where Ms. Norra never met her initial burden of proof, the burden for Reidland shifts to the objecting parties to demonstrate that Ms. Norra's homestead rights on the disputed portions of Reidland have terminated. *See Perry*, 345 F.3d at 311.

The State and Harris County have both objected to portions of Ms. Norra's claimed homestead at Reidland.  The State does not dispute that all the real estate and four of the mobile

homes at Reidland comprise Ms. Norra's exempt homestead.[9]   The State objects to the classification of all the remaining mobile homes at Reidland as part of Ms. Norra's homestead. Further, Harris County does not dispute that Trailer #22 is part of Ms. Norra's homestead. However, Harris County objects to the remaining mobile homes at Reidland and also seeks to subdivide Ms. Norra's Reidland real estate into homestead and non-homestead portions.

"Unless the claimant has *abandoned* part of the homestead, Texas law does not favor the severance of a single contiguous tract of land into homestead and non-homestead sections." *Bradley*, 960 F.2d at 508 (emphasis added); s*ee also Id.* at 502 ("[C]ontinuity of parcels presents a situation favorable to the extension of the homestead to the outside boundaries of the land.") (citing *Youngblood*, 76 S.W.2d at 760).   "Absent abandonment, the severance of a tract of land from the homestead is permissible only if there is *no* evidence that the severed tract is used for homestead purposes." *Id.* at 509 (emphasis in original).

This Court must therefore address three questions concerning Reidland:

i.   Has Ms. Norra abandoned any portion of Reidland?

ii.  If Ms. Norra has not abandoned any portion of Reidland, is there evidence that at least a portion of Reidland is used for homestead purposes?

iii. Are the disputed mobile homes on Reidland part of Ms. Norra's homestead?

**i.   Has Ms. Norra Abandoned a Portion of Reidland?**

The Court's analysis of Reidland begins with the Fifth Circuit's *Perry* decision. *See Perry*, 345 F.3d at 303.   In *Perry*, the debtor, Robert Perry, claimed a 26 acre tract and an adjoining 59 acre tract as his homestead. *Id.* at 307.   Perry operated a mobile home and RV park on the 26 acre tract. *Id.*   Perry also lived behind the park's office and convenience store on a 1.34

---

[9] The specific mobile homes that the State does not dispute are #1, #2, #22, and #28.

acre plot within the 26 acre tract. *Id.* There was a sewage treatment plant and recreational facility on the adjoining 59 acre tract, which was used in conjunction with the park. *Id.*

Perry filed bankruptcy and claimed the 26 and 59 acre tracts as his homestead. *Id.* at 308. The bankruptcy court denied Perry's homestead claim except for the 1.34 acre tract upon which Perry and his wife lived. *Id.* The bankruptcy court held that the 59 acre tract was "not exempt because it was insufficiently related to the 1.34 acre tract" and that all but 1.34 acres of the 26 acre tract had been abandoned. *Id.* The bankruptcy court based its abandonment holding on the fact that Perry had operated a business on the 26 acre tract.[10] *Id.* The district court "reversed the bankruptcy court's decision [with regard to the 26 acre tract] on the grounds that Texas permits the operation of a business on a rural homestead." *Id.* at 315. On appeal, the Fifth Circuit recognized that it was faced with a relatively novel legal question concerning the operation of a mobile home park on the 26 acre tract:

> Because the 'business' or 'calling' of rural of rural residents has traditionally been agricultural, the Texas Supreme Court has not yet been presented with the opportunity to pass upon a case that involves (a) a rural resident, who claims (b) rural property, that is (c) on the same tract as his residence and (d) is used for non-agricultural purposes as part of his homestead.[11]

---

[10] The bankruptcy court held that the 26 acre tract had been abandoned for two independent reasons. *Id.* The first reason (which is not relevant in this case) was because Perry had previously conveyed the 26 acre tract to a corporation that he had formed. *Id.* The second basis for abandonment was because Perry had operated a business on the property. *Id.*

[11] After explaining the lack of Texas Supreme Court precedent, the Fifth Circuit stated "*But see*, *Hollifield v. Hilton*, 515 S.W.2d 717, 717-721 (Tex. Civ. App. 1974), *writ ref'd*, *n.r.e.* (holding that where appellants owned and resided upon contiguous 60-acre rural farm and used 18 acres as a mobile park, 18-acre tract was part of the rural homestead.)." *Id. Perry* also referenced *Hollifield* on two other occasions concerning the relevant case law for the 26 acre tract homestead question. *See Id.* at 319. As discussed in more detail below, and based on the Fifth Circuit's use of *Hollifield*, this Court considers *Hollifield* to be controlling authority.

*Id.* at 318.  After providing instructions[12] for resolving the 26 acre tract dispute, the Fifth Circuit vacated the bankruptcy court's decision and remanded the case for further proceedings. *Id.* at 319.

*Perry* determined that resolution of the 26 acre tract issue ultimately rested upon whether the debtor temporarily or permanently rented the property at issue. *Id.*  A "significant body of Texas case law indicat[es] that one who rents a section of his property continuously to others, abandons that portion of his property for purposes of the homestead laws."[13]  *Id.* (citations omitted).  However, "[r]enting property does not always abandon it for purposes of the homestead laws.  Indeed, the Constitution and Texas Property Code protect the homestead status of property that is only temporarily rented." *Id.* at 319 (citing TEX. CONST. art. XVI, § 51; TEX. PROP. CODE ANN. § 41.003).  Ultimately, "whether [the debtor] temporarily rented portions of his homestead property or did so permanently in such a manner that he abandoned the property as his homestead is a question of fact . . . . [and] the party opposing the homestead claim . . . carries the burden." *Id.* (citations omitted).

In order to determine whether property has been rented on a temporary or permanent basis, *Perry* directs courts to conduct a two-step inquiry:

> As an initial matter, the court should determine whether, and if so, over what portions of property, [the debtor] released possession and control. *See Hollifield v. Hilton,* 515 S.W.2d 717 (Tex. Civ.App.1974) (finding that property

---

[12] *Perry's* instructions began with an overview of the treatment of businesses that operate on rural homesteads.  The Fifth Circuit recognized that "a business element has historically been embedded within the definition of a rural homestead." *Id.* at 316.  Indeed, the "purpose of the homestead exemptions, both urban *and* rural, has been to protect not only the home, but also the property that enables the head of the household to support the family." *Id.* at 317 (emphasis in original).  *Perry* determined that, "[i]n the absence of a clear statement expressly limiting the scope of the rural homestead to property used for home or agricultural purposes, we cannot agree that the operation of a business [on contiguous property], without more, necessarily forfeits a rural homestead interest." *Id.* at 318.

[13] The Fifth Circuit further explained that the "cases justify portioning a single piece of land into homestead and non-homestead portions . . . not because renting constitutes a business . . . but because by permanently renting the property to others, the owners surrender possession and control of the property.  In so doing, they evince an intention to abandon it for homestead purposes." *Id.* (citations omitted).

used as mobile home park was only temporarily rented to others because tenants were month-to-month). Then, the court should consider [the debtor's] intent with respect to that portion of the property. *Gonzalez v. Guajardo de Gonzalez,* 541 S.W.2d 865, 867 (Tex. Civ. App.1976). If [the debtor] intended to resume control over the property, the property will not lose its homestead character. *Hollifield,* 515 S.W.2d at 721 (finding lack of intent to abandon homestead when claimant testified to that effect and when rental property could be reconverted to agricultural use with minimal effort).

*Id.*

Before applying the *Perry* inquiry to the abandonment question in the case at hand, the Court finds it necessary to review *Hollifield v. Hilton*, which is cited numerous times in *Perry*. *See Id.* at 318-19 (citing *Hollifield v. Hilton*, 515 S.W.2d 717 (Tex. Civ. App.—Forth Worth 1974, wit ref'd n.r.e.)).

In *Hollifield*, the Hollifields converted 18 acres of their contiguous 60 acre rural homestead into a mobile home park.[14] *Hollifield*, 515 S.W.2d at 719.  On March 6, 1968, in order to fund the construction of the park, the Hollifields executed a mechanic's lien contract with the developer of the 18 acres, which was later assigned to Mansfield State Bank. *Id.*  The mechanic's lien agreement and deed of trust later given by the Hollifields to Mansfield State Bank both contained "an express recital that the 18 acres therein described was not owned, used or claimed by [the Hollifields] as exempt from forced sale." *Id.* at 720.  Testimony from numerous witnesses at trial also indicated that the Hollifield's residence, which was located near the 18 acres, was not within the 18 acre boundary encumbered by the lien. *Id.*  The Hollifields subsequently defaulted on the loan and the 18 acre property was sold at a foreclosure sale conducted on March 6, 1973. *Id.* at 719.

---

[14] The conversion consisted of a "roadway, utility lines, small concrete patios and a septic tank and underground sewage system, in order for the Hollifields to see if they could rent parking spaces for mobile homes thereon." *Id.* These improvements are quite similar to those that exist at Reidland.

17 / 29

The dispute in *Hollifield* arose out of the fact that the Hollifield's residence was actually located within the 18 acres sold at the foreclosure sale, despite written agreements and testimony indicating that this was not anticipated by the parties in 1968.[15] *Id.* The Hollifields claimed that the lien did not extend to the entire 18 acres "because the improvements financed by the loan were not made on their residence or to the whole parcel of the land." *Id.* They argued that the lien only applied to the mobile home park because "improvements were made only upon that portion of the land where the mobile home park is situated and this portion had been *abandoned* by the Hollifields as their homestead." *Id.* (emphasis added). Under Texas law, liens on improvements to the homestead are valid against the whole homestead. *Id.* However, liens on property that was formerly part of the homestead but has since been abandoned are valid only against the abandoned portion and do not encumber the whole homestead. *Id.* The Hollifields sought to limit the scope of the lien by claiming that the lien was not an improvement to the homestead but was instead only an improvement to the portion of the land that had been abandoned (the mobile home park).[16] *Id.*

Thus, unlike this case where the objecting parties claim that Ms. Norra abandoned a portion of her homestead, in *Hollifield,* it was the debtors who argued that a portion of the homestead was abandoned. Nevertheless, the abandonment inquiry is the same regardless of whether it is the debtor or the objecting parties arguing in favor of abandonment. This Court will therefore follow *Hollifield's* abandonment analysis in this case.

---

[15] *Hollifield* does not suggest that fraud or deceit played a role in the extension of the lien to the Hollifield's residence. *Id.* at 719-20. Although it is not explicitly stated, *Hollifield's* discussion of the facts implies that the residence was included by mistake, due to the carelessness of the parties to the loan agreements. *Id.*

[16] The "sole question" at trial was whether the lien covered the entire 18 acres or was limited only to the land covered by the mobile home park. *Id.*

In *Hollifield*, the Texas Court of Civil Appeals found that "the lien foreclosed was a valid lien upon the entire 18 acre tract whether homestead or not and further that there was ample evidence to support the findings and holding that the [Hollifields] *did not abandon* any part of the 18 acres or a portion of their rural homestead either by intent or by use." *Id.* at 721 (emphasis added).  Thus, despite the Hollifield's intent to operate a mobile home business on a portion of the land for **at least 5 years**[17], the Court found that the land was nevertheless **rented on a temporary basis**.

The *Hollifield* Court based its decision that the property had not been abandoned upon numerous facts, including:

> [Mr. Hollifield] always had the express intent that the area covered by the mobile home parking area would remain a part of his homestead.  His rentals were always on a *temporary basis, month-to-month,* so that he could ask any tenant to move on short notice, and that a minimum of effort would be required to return the area to strictly agricultural use because *all of the improvements were underground or surface-level improvements, entailing the erection of no buildings or structures.*

*Id.* at 719-20 (emphasis added).  Although other facts were discussed[18], this Court finds the facts that (i) the rentals were on a month-to-month basis, and (ii) the land could be restored with "a minimum of effort," to be of primary importance.  These two facts are particularly significant because they were cited by the Fifth Circuit in *Perry's* instructions for determining whether land has been temporarily or permanently rented. *See Perry*, 345 F.3d at 319.  Furthermore, nothing in *Perry* indicates that the Fifth Circuit disagreed with *Hollifield*. *See Id.* at 318-19.  In fact, all of *Perry's* statements indicate that the Fifth Circuit views *Hollifield* as the correct application of

---

[17] By March 6, 1968, when the mechanic's lien was executed, the Hollifield's clearly intended to use a portion of the 18 acres for a mobile home park.  The foreclosure sale occurred exactly five years later, on March 6, 1973.  Thus, although *Hollifield* did not precisely state how long the Hollifields intended to operate a mobile home business on the land, this Court presumes that the intent existed for at least 5 years.

[18] The Court also recognized that "[t]he mechanic's lien contract was made for only 12 mobile home parking spaces with the idea of going into it on a trial basis, not knowing whether it would prove profitable.  [Mr. Hollifield] saw no inconsistency with his homestead claim for such temporary rental use of that portion of the farm." *Id.* at 719.

Texas homestead law concerning contiguous mobile home businesses. *See Id.*  Thus, this Court considers *Hollifield* to be controlling authority.

In this case, according to *Perry*, the Court must first determine whether Ms. Norra "released possession and control" over a portion of her residence at Reidland through operation of the mobile home park. *See Perry*, 345 F.3d at 319.  Like the mobile home park in *Hollifield*, tenants at Reidland rent on a month-to-month basis.  The evidence at trial indicated that vacancy levels fluctuate monthly and tenants regularly stay at Reidland for short periods of time.  Based on the significance attributed to temporary, month-to-month leases in *Perry* and *Hollifield*, the Court finds that Ms. Norra has not permanently released possession and control over any part of Reidland.  Ms. Norra has only temporarily released possession and control of various mobile homes when the homes are actually occupied by tenants.  However, Ms. Norra is able to regain possession and control of any of these occupied mobile homes in 30 days, if she chooses not to renew the lease.

This finding is also supported by additional factors unique to Reidland which reflect Ms. Norra's continued possession and control over all of Reidland, except for the occupied mobile homes.  First, Ms. Norra has the power to enter (and use) any of the vacant[19] mobile homes at-will.  To illustrate, Ms. Norra initially moved to Trailer #12 but eventually moved to Trailer #22.  Ms. Norra also uses various empty mobile homes for personal storage.  Second, all of the residents at Reidland, including Ms. Norra, access their respective mobile homes through one shared road that runs through Reidland.  Third, none of the mobile home spaces are set apart by a fence or other form of property dividing structure; this enables Ms. Norra to freely walk and

---

[19] The Court finds that Ms. Norra intends to rent the vacant mobile homes that are habitable in the future and that Ms. Norra hopes to restore the dilapidated mobile homes.  The Court finds, however, that the desire to temporarily rent homestead property at some point in the future does not deprive property of its homestead character. *See Bradley*, 960 F.2d at 509 ("*Unsuccessful* attempts to sell or develop property do not deprive it of its homestead character.") (emphasis in original) (citations omitted).

recreate throughout the Reidland property unimpeded.  In fact, the evidence indicated that Ms. Norra—who is far from a benevolent landlord—did not respect the privacy rights of her tenants and never gave up full dominion over any of the land at Reidland.  Ms. Norra provided tenants with the right to occupy mobile homes, but she continuously treated all the land upon which the mobile homes sat as her own.  Fourth, a number of the mobile homes are dilapidated and uninhabitable.  Ms. Norra has used these mobile homes as a source for spare parts.  Overall, these facts indicate that Ms. Norra continuously maintains possession and control over most of Reidland.

Next, *Perry* directs this Court to consider the debtor's "intent with respect to [the disputed] portion of the property." *See Perry*, 345 F.3d at 319.  The Court must determine whether Ms. Norra intends to "resume control over the property." *Id.*  The Court has already found that Ms. Norra controls most of the property at Reidland, except for the mobile homes that are actually occupied.  The Court now finds that Ms. Norra intends to resume control over the mobile homes that are temporarily occupied by tenants.

This determination is supported by the Fifth Circuit's use of *Hollifield* in *Perry* when explaining the "intent to resume control" inquiry. *See Id.*  *Perry* cited *Hollifield* for "finding lack of intent to abandon homestead when the claimant testified to that effect and when rental property could be reconverted to agricultural use with minimal effort." *Id.*  In this case, Ms. Norra has claimed that all of her property at Reidland is her homestead and that she does not intend to abandon the mobile homes that are rented to tenants.  Furthermore, as in *Hollifield*, the Court finds that the Reidland property could be converted to a different[20] use "with minimal

---

[20] The Court recognizes that in *Hollifield* the "different" use of the park was for agricultural purposes.  The Court does not believe, however, that the only permissible conversion is for agricultural usage. *See Perry*, 345 F.3d at 318. Any conversion of a temporarily rented mobile home park for a permissible homestead purpose should qualify as a "different" use. *See Id.*

effort." *See Id.*  The improvements made at Reidland are very similar to those that were made in *Hollifield*.  In addition to the mobile homes at Reidland, the improvements basically consist of a septic tank, sewage system, and shared road.  The only permanent structures at Reidland are mobile homes, which, although permanently affixed to the land[21], can be moved with relative ease since they sit on concrete blocks.

Accordingly, the objecting parties have not carried their burden of demonstrating that Reidland has been permanently rented.  The facts unique to Reidland indicate that Ms. Norra has only temporarily rented mobile homes at Reidland.  Thus, the Court holds that Ms. Norra has not abandoned any of the real property at Reidland.

The Court nevertheless recognizes that a mobile home park has operated at Reidland for over 20 years and will likely continue to operate in the future.  At first glance, it appears reasonable to conclude that this fact, alone, greatly weakens Ms. Norra's ability to claim that Reidland is only temporarily—instead of permanently—rented.  However, the Court rejects that proposition for four reasons.

First, the Fifth Circuit did not question whether the mobile home park in *Hollifield* was temporarily rented despite the five year period in which the Hollifields intended to operate the park.  *Hollifield* and *Perry* both focused upon the temporary nature of the leases at the mobile home park, not the overall duration in which the park was in operation.  This case involves the same temporary month-to-month leases that were at issue in *Hollifield* and the Court does not see why the outcome should change simply because the rental business has existed for over 20 years, instead of 5 years.

---

[21] *See Norris v. Thomas*, 215 S.W.3d 851 (Tex. 2007) (recognizing that a mobile home is permanently affixed to the land when it sits on cement blocks and receives water and sewer service).

Second, it is a fundamental and longstanding policy that Texas homestead laws are to be liberally construed. *Webb*, 263 B.R. at 791.  The Texas Constitution explicitly provides that the homestead may be rented temporarily without losing its homestead character. *See* TEX. CONST. art. XVI, § 51 (stating that "any *temporary renting* of the homestead shall not change the character of the same, when no other homestead has been acquired") (emphasis added).  This case involves construction of the phrase "temporary renting."  Texas policy encourages the Court to interpret the phrase liberally.  Given this policy, it is reasonable to conclude that "temporary" includes the renting of mobile homes on a month-to-month basis, especially since vacancy levels at Reidland regularly fluctuate.

Third, a policy relied upon by the Court in *Holllifield* is also triggered in this case: "[A]cceptance of the . . . [objecting party's] theory . . . would pose a real danger to every homestead claimant in Texas because his homestead would be subject to attack by creditors that he abandoned a portion of his homestead by using it for non-agricultural purposes." *Hollifield*, 515 S.W.2d at 721.  Similarly, the Court is concerned that any other outcome would require homestead claimants to expend inordinate resources litigating over whether a particular rental (say, a home rented on a month-to-month basis while a serviceman was overseas for an extended tour of duty) constituted temporary or permanent rental.

Fourth, this Court's decision is buttressed by other recent Texas cases concerning non-agricultural businesses that operate on urban homesteads. *See Majewski v. Majewski*, 163 S.W.3d 102 (Tex. App.—Austin 2005, no pet.); *Sifuentes*, 2009 WL 1099253, at *1.  In *Sifuentes*, the court held that the homestead claimant's entire four-plex building was exempt, despite the fact that the claimant lived in one unit and rented out the other three units of the four-plex. *Sifuentes*, 2009 WL 1099253, at *1.  The objecting creditor argued that the layout of the property—which

had separate units and a privacy fence separating each units' yard—demonstrated the claimant's intent to keep only 25% of the four-plex as his homestead. *Id.* at *4. Based on prior Texas case law, the court determined that the claimant could establish an entire building as his homestead, even if the claimant continuously rented separate rooms. *Id.* The court also noted that the privacy fences, "which were only a few feet in length, did not impede free passage from any part of the lot to any other. This arrangement [did] not dictate that [the claimant] possessed and used only one-fourth of the property for homestead purposes." *Id.*

The outcome here is consistent with *Sifuentes*, and it is this consistency—regardless of whether the rental property is a four-plex home or a mobile home park—that further supports the Courts decision in this case. Additionally, the court notes that there are no privacy fences on Reidland. Thus, *Sifuentes* underscores the significance of Ms. Norra's ability to freely walk throughout Reidland unimpeded.

*Majewski* also provides additional support for the Court's abandonment decision. In *Majewski*, Bernard Majewski claimed a 5.8 acre tract of land as his urban homestead. *Majewski*, 163 S.W.3d at 105. Majewski lived on a portion of the tract in a building named the "Bishop Center," where Mr. Majewski also operated a bar and pool hall. *Id.* at 104. There was a parking lot in the front of the Bishop Center. *Id.* at 105. A fence at the rear of the Bishop Center separated the Bishop Center portion from the rest of the 5.8 acre tract. *Id.* On the other side of the fence, Majewski had "several mobile and rental homes, some of which [were] uninhabitable, several mobile home lots, junk cars, pieces of equipment, a service station, and a billboard." *Id.* at 104. Several of these structures behind the fence were rented to third parties. *Id.* at 105.

Geraldine Wesch, the daughter of Majewski's deceased wife, objected to the rented portion of Majewski's claimed homestead.[22] *Id.* ("Wesch argued that the rental of portions of the property defeated Majewski's homestead rights.").  The trial court granted Wesch's motion for summary judgment, "finding that Majewski's homestead consisted only of the Bishop Center, the fenced yard behind the building, and the parking lot.  The remainder of the property behind the fence was found not to be his homestead because it was not used for homestead purposes or to exercise a business or calling." *Id.*

The Texas Court of Appeals reversed and remanded the trial court, holding that the "trial court erred in finding that, *as a matter of law*, Majewski was not entitled to claim any of the land behind the fence as his homestead." *Id.* at 108 (emphasis in original).  The court acknowledged that "[r]enting or leasing property has generally not been considered a business or calling, even if rental income is an individual's sole source of income." *Id.* at 109.  But, on the other hand, the Court recognized "[t]emporarily renting homestead property to another . . . does not change the property's homestead character." *Id.*   The court then remanded so that the trial court could receive evidence and then determine the effect of the rental operation on Majewski's homestead claim. *Id.* at 109-10.

*Majewski* also stated that even if some portion of the rented property had lost its homestead character, it does not necessarily follow that none of the property behind the fence qualifies as a homestead:

> The evidence shows that some portion, indeed a substantial portion, of the land behind the fence is either not in use at all or is used by Majewski for storage of his personal items and for his own use.  The evidence is unclear about exactly what percentage of the property behind the fence is actually rented.  Majewski

---

[22] Wesch did not dispute that the Bishop Center (including parking lot and fenced yard) was Majewski's homestead. *Id.* at 108.  Texas law explicitly permitted Majewski to exempt the bar and pool hall he operated at his residence because the Bishop Center was used "as both an urban home and a place to exercise a calling or business." *See Id.* (citing TEX. PROP. CODE. ANN. § 41.002(a)).

> acknowledged renting four housing units, but stated that several of the other houses or mobile homes are not rented and in fact are uninhabitable.

*Id.* at 110.  This statement strongly implies that mobile homes that are used for storage or that are uninhabitable remain part of the homestead.

*Majewski*, although it dealt with a summary judgment, supports this Court's abandonment decision because it recognizes the importance of a fact specific inquiry on homestead questions involving rental property.  A homestead does not automatically lose its homestead character simply because a portion of the homestead may be occupied by tenants. *Majewski* and this Court agree that Texas law requires courts to look into the exact nature of the rental arrangement before determining whether the property satisfies Texas's homestead requirements.

Furthermore, *Majewski* supports this Court's decision because it implied that vacant mobile homes—including mobile homes that are dilapidated or used for storage—are part of the homestead. *See Id.* (distinguishing vacant or dilapidated mobile homes from those that are "actually rented").  On a related point, *Majewski* also implied that open green space near occupied mobile homes also retains its homestead character. *See Id.*  Therefore, although the specific facts of each case are unique, *Majewsk's* implications support this Court's finding that the vacant mobile homes and open space on Reidland qualified as Ms. Norra's homestead.

### ii.  Is There "No Evidence" That a Portion of Reidland Qualifies as a Homestead?

Since the Court finds that Ms. Norra has not abandoned any of the property at Reidland, the Court may not sever any portions of Reidland unless "there is *no* evidence that the severed tract is used for homestead purposes." *See Bradley*, 950 F.2d at 502 (emphasis in original).  The Court finds that Harris County has failed to meet its burden of proof on this point.

Approximately 15 mobile homes at Reidland are vacant, many of which are dilapidated and uninhabitable.   Other than maintenance personnel acting at the direction of Ms. Norra, Ms. Norra is the sole individual with the ability to access and control these vacant mobile homes. When Ms. Norra first moved to Reidland in early 2005, she occupied Trailer #12.  Ms. Norra later moved to Trailer #22.  The Court finds no reason why Ms. Norra could not relocate once again to another vacant trailer, which she could renovate.  Ms. Norra also uses many of these vacant mobile homes as storage sites and sources for spare parts.  This usage, coupled with Ms. Norra's ability to freely move from one vacant mobile home to another, is ample evidence of Ms. Norra's use of the vacant mobile homes for "homestead purposes."

Furthermore, with regard to the mobile homes that are currently occupied by tenants, Ms. Norra only leases these mobile homes on a temporary 30-day basis.  After 30 days, nothing prevents Ms. Norra from using any of the occupied mobile homes for personal living or storage use, or as a source for spare parts.  Ms. Norra also shares an access road with the Reidland tenants and Ms. Norra can walk freely throughout or otherwise use[23] the grounds at Reidland.

Based upon these facts, the Court cannot conclude that there is "no evidence" that any portion of Reidland is used for "homestead purposes."  Accordingly, since (i) Ms. Norra has not abandoned any portion of Reidland, and (ii) there is evidence that the portions of Reidland disputed by Harris County are used for "homestead purposes," the Court holds that Reidland cannot be severed.  All of the real property at Reidland therefore qualifies as Ms. Norra's homestead.

###    iii.   Are the Disputed Mobile Homes on Reidland Part of Ms. Norra's Homestead?

The only issue left for the Court to consider is the extent to which the disputed mobile homes at Reidland qualify as realty and are therefore part of Ms. Norra's homestead.  The Texas

---

[23] As stated above, Ms. Norra's past behavior indicates that she retains dominion over all of the land at Reidland.

Constitution provides that the rural homestead includes "the improvements thereon." TEX. CONST. art. XVI, § 51. In order to qualify as an "improvement," personalty, such as a mobile home, must be "annexed to the realty." *Sonnier v. Chisholm-Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995) ("There can be no improvement without annexation to realty, and until personalty is annexed to realty, it by definition cannot be an improvement.").

In *Norris*, the Texas Supreme Court reviewed multiple cases concerning when mobile homes become sufficiently annexed to real property to qualify as part of the homestead. *Norris*, 215 S.W.2d at 855-57. *Norris* provided a summary of these cases that guides the Court in this case:

> In *Clark*, setting a trailer home on four wooden blocks and connecting it to electrical service was sufficient to attach the trailer to real property. In *Gann*, where the house trailer remained on wheels, merely parking the movable trailer on real property was insufficient to attach the trailer to the property. In *Walker*, removing the wheels of a mobile trailer home, setting it on cement blocks, and connecting it to water, sewer, and gas service was sufficient to attach the mobile trailer to real property. And in *Ditto,* removing the wheels of a mobile home, setting it on concrete blocks with eight-foot buried anchors, and connecting it to electrical and plumbing service was sufficient to give it homestead protection.

*Id.* at 857 (citations omitted).

In this case, the mobile homes at Reidland sit on concrete blocks. The mobile homes receive sewage and water services. This fits squarely within the cases discussed in *Norris* that found mobile homes on blocks with electrical, sewage and water services were sufficiently annexed to the real property. Accordingly, the Court finds that all of the mobile homes at Reidland are sufficiently annexed to the real property to qualify as an exempt "improvement" to Ms. Norra's homestead. Ms. Norra is therefore entitled to claim all of the land and all of the mobile homes at Reidland as her homestead.

**Conclusion**

For the reasons stated above, the Court holds that neither the land nor the mobile homes at Lauder constitute Ms. Norra's homestead, and, all of the land and mobile homes at Reidland qualifies as Ms.Norra's homestead.  A separate order will be issued.

SIGNED **November 2, 2009.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE